**D. C. TRANSIT SYSTEM, INC.,**
Petitioner,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMIS-SION,** Respondent,

and

**District of Columbia Council et al.,**
Intervenors.

**No. 72–1555.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 22, 1972.

Decided July 28, 1972.

Certiorari Denied Dec. 18, 1972.
See 93 S.Ct. 688.

Mr. Harvey M. Spear, New York City, for petitioner.

Mr. Frank F. Flegal, Sp. Counsel, Washington Metropolitan Area Transit Comm., with whom Messrs. Bernard Dobranski, Gen. Counsel, and Stephen L. Sharfman, Counsel, Washington Metropolitan Area Transit Comm., Washington, D.C., were on the brief, for respondent.

Mr. Edward B. Webb, Jr., Sp. Counsel, District of Columbia Council, Washington, D.C., for intervenor District of Columbia Council.

Mr. Michael J. Valder, Washington, D.C., with whom Mrs. Elizabeth B. Kleeman, Xenia, Ohio, was on the brief, for intervenor Black United Front.

Miss Diana K. Powell, pro se, intervenor.

Before FAHY, Senior Circuit Judge, and ROBINSON and MacKINNON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The question for decision is whether the Washington Metropolitan Area Transit Commission erred in conditioning further consideration of a fare increase for a financially ailing carrier upon satisfaction of requirements designed to improve its service. We hold that, in the circumstances presented, the Commission's action is legally unobjectionable. We accordingly affirm the orders under review.

## I. BACKGROUND OF THE LITIGATION

*The Administrative Proceeding*

On December 28, 1971, D.C. Transit System, Inc. (Transit), filed two tariffs [1] with the Commission which alternatively designated changes in its fares for regular-route transportation of passengers in the District of Columbia and its Maryland and Virginia suburbs. The filings were accompanied by data indicating a net operating loss during an historical twelve-month period ending September 30, 1971, and forecasting another loss during a corresponding period ending April 30, 1973. To enable a suitable return in the future annual period, Transit proposed a variety of fare increases, notably for its intra-District cash and token patrons.[2] Transit designated January 27, 1972, as the date on which the new fares would take effect.

Transit submitted with the tariffs a motion for fare raise pending determination by the Commission of the general increment it sought. The Commission denied the motion, holding that an interim advance would not serve the public interest, and set hearings to begin at an early date. On January 26, 1972, the Commission suspended Transit's newly-filed tariffs through April 26, and on April 25 further suspended them until May 26. The hearings commenced in mid-February and, with numerous parties participating extended well into May.[3] On May 19, the Commission,

1. See Franchise Act § 7, 70 Stat. 598 (1956) ; Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, §§ 5(a), 6(a) (Compact). The Compact is incorporated into Pub.L. 86–794, 74 Stat. 1031 (1960), and is set forth in full following D.C.Code § 1–1410 (1967). Amendments to the Compact appear as a part of Pub.L. 87–767, 74 Stat. 765 (1962), and are set forth following D.C.Code § 1–1410a (1967).

2. Transit's first alternate tariff would increase the cash fare from 40 cents to 50 cents, and the token fare from 5 for $2.00 to 5 for $2.25 in the token fare, for regular service within the District of Columbia. Transfers would remain free, as they presently are. The second

alternate tariff would increase the cash fare to 45 cents, the token fare to $2.25, and levy a 5-cent charge for transfers except on school tickets. Each tariff specifies increases for other intra-District services, for intra-Maryland services, and for Maryland and Virginia inter-state services.

3. Ten protestants and intervenors were admitted to the proceedings. Formal hearings consumed 24 days. Hearings on two additional days, in which 29 persons participated, afforded interested nonparty citizens an opportunity to express their views. The transcript of testimony and argument aggregates 4,483 pages.

with one member dissenting,[4] promulgated its primary order, No. 1216,[5] denying a fare increase, and by Order No. 1219,[6] issued on June 16, denied reconsideration of that ruling. These are the principal orders now under review.[7]

Since we later examine the Commission's orders closely, we confine our recitation at this stage to their highlights. The Commission, on preliminary examination of the financial data submitted by Transit, discerned a probable need for additional revenues.[8] The Commission found, however, that management decisions over the years had left Transit with an unstable financial structure which in turn had contributed substantially to an operation presently uneconomical and inefficient and a service seriously deteriorated.[9] In the Commission's view, the Washington Metropolitan Area Transit Regulation Compact[10] required it to insure not only the reasonableness of rates permitted regulated carriers but also the economy, efficiency and adequacy of their service to the public.[11] The Commission concluded that it could not discharge its responsibilities by granting Transit a fare raise without

prior demonstration of Transit's willingness to ameliorate its financial situation by capital funding from sources other than its fareboxes.[12] Attributing Transit's financial plight more largely to management than to insufficient revenues,[13] and recounting a nine-year history of recalcitrance despite exhortation to remedy its ills,[14] the Commission found a lack of assurance that corrective measures would be adopted even if it established funding requirements concurrently with an award of higher fares.[15] The sole alternative, the Commission decided, was the company's acquisition of new capital as a precondition to any such addition.[16]

On these grounds, the Commission, in Order No. 1216, found that the fare increases set forth in Transit's tariff filings were unjust and unreasonable.[17] It ruled that, as a condition precedent to any elevation of fares, Transit must generate $6.4 million in new capital and allocate it to debt retirement and bus purchases in designated amounts.[18] It directed that, pending compliance, Transit continue to charge the regular-route fares then in effect.[19] As already men-

4. See note 7, *infra*.

5. D.C. Transit Sys., Inc. (Order No. 1216) (WMATC May 19, 1972) (not yet reported).

6. D.C. Transit Sys., Inc. (Order No. 1219) (WMATC June 16, 1972) (not yet reported).

7. The additional orders are No. 1216–A, issued May 25, 1972, which is the dissenting opinion of the Commission's vice chairman, and No. 1216–B, issued the same day, which is the majority's supplemental order in response to the dissent.

8. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 7, 16. See also D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 2.

9. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 8–14; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 1.

10. See note 1, *supra*.

11. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 14–15; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 1, 4–8, 15.

12. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15–16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 2, 9–12.

13. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 9.

14. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 9–11.

15. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 2, 9–11.

16. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15–16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 9–11.

17. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 17.

18. *Id.* at 15.

19. *Id.* at 17.

tioned, Transit subsequently [20] applied for reconsideration,[21] which by Order No. 1219 the Commission denied,[22] and the proceeding before us is for review of those orders.[23] We denied a motion by Transit for extraordinary relief pending review [24] and, with excellent cooperation from counsel, have expedited our consideration on the merits.

## The Loconto Reports

In reaching its conclusions, the Commission drew heavily upon the results of an in-depth study of Transit's financial condition. The Commission had ordered the study made with a view to assessing the full implications and isolating the underlying causes of Transit's condition.[25] The study was made by Pasquale A. Loconto, a partner in a consulting firm employed by the Commission for the purpose. Loconto probed into Transit's financial history, analyzed its capital and debt structures, reached conclusions as to the need for improvements and formulated recommendations as to the steps by which financial stability might be achieved.[26] Loconto prepared a report, which was placed in the administrative record, and he also appeared as an expert witness in the proceeding and stood cross-examination on the conclusions and recommendations of his report.[27] What we now summarize are the Commission's discussions of the report, and the findings it based thereon.

Loconto called attention to substantial increases in Transit's current and long-term liabilities and accompanying declines in reserves and retained earnings.[28] He also identified, as concomitants of steadily growing operating revenues, heightening operating revenue deductions, fluctuating operating income, and constantly rising interest ex-

20. On May 25, Transit notified the Commission that it believed Order No. 1216 to be invalid and that, unless enjoined, it intended to put the proposed fares into operation on May 27. Transit tells us that, to avoid resulting chaos, it invited the Commission to seek an immediate test of the order's validity and pledged its cooperation in such a venture. On the day following, the Commission sued for an injunction. Washington Metropolitan Area Transit Comm'n v. D.C. Transit Sys., Inc., Civ. No. 1061–72 (D.D.C.). See Compact, *supra* note 1, tit. II, art. XII, § 17(a). Another suit seeking similar relief was concurrently filed, Murphy v. D.C. Transit Sys., Inc., Civ. No. 1060–72 (D.D.C.), and the two actions were consolidated. On June 1, the District Court enjoined violation of the order and, on the same day, Transit filed its application for reconsideration by the Commission. Appeals from the District Court's injunctive order are pending in this court.

21. See Compact, *supra* note 1, tit. II, art. XII, § 16.

22. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 16, 18.

23. See note 7, *supra*, and accompanying text.

24. The motion sought an order staying operation of Orders Nos. 1216 and 1219 and permitting Transit's proposed fares to become effective. The Commission had previously denied a similar request, partly on the ground that it lacked authority to grant it. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 16.

25. The events precipitating the study— part of a formal investigation into Transit's financial situation—was Transit's inability to arrange financing for the purchase of new buses. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 9; D.C. Transit Sys., Inc. (Order No. 1188) (WMATC Dec. 16, 1971) (not yet reported).

26. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 9.

27. *Id.* Transit did not object to introduction of the report into evidence or the testimony Loconto gave.

28. "[C]urrent liabilities of the company have increased since 1957 by $10.5 million to a current level of $14.7 million. Long-term payables are up from $5.4 million. Reserves and other liabilities declined from $12.1 million in 1957 to $3 million in 1970. Stockholders' equity consists of (1) $500,000 representing capital stock which amount has remained constant throughout the period, and (2) retained earnings which have decreased from a high of $3.8 million in 1964 to $1.5 million in 1971." *Id.* at 9–10.

pense [29]—the latter, by the Commission's appraisal, "a major contributing factor in Transit's poor profit picture." [30] A drop in Transit's current ratio—the relationship of current assets to current liabilities—"indicates an extreme lack of liquidity," said Loconto, and "little provision for unevenness in the flow of funds available to meet current liabilities." [31] "If," Loconto continued, "that flow should decline even temporarily, a condition of insolvency could conceivably result." [32] The ratio of Transit's debt to stockholder's equity, the relationship of funds generated by opera-

tions to interest coverage and long-term debt, and the percentage of stockholders' equity to total assets, as well as other relationships examined by Loconto, "similarly indicated a worsening financial picture for D. C. Transit." [33] In Loconto's opinion, "[t]he combination of trends presented . . . indicates that the financial condition of the company has been steadily declining during recent years." [34]

Loconto's analysis of capital structure included a comparison with ten other privately-owned transit companies on a number of financial aspects. [35] These

29. "The report aso examines operating trends. Operating revenues have increased each year for a total increase of $22.5 million since the company began operation. Operating revenue deductions have also increased, that total increase being $23.3 million. Operating income during the period has ranged from a high of $2.3 million in one year to a low of a $48,000 loss in another. Interest expense has increased from $384,000 in 1957 to $1.4 million in 1970. The increasing interest expense has been a major contributing factor in Transit's poor profit picture." *Id.* at 10.

30. See note 29, *supra.*

31. Loconto explained that "[c]urrent ratio is a measure of the liquidity of a company, or its ability to meet its current obligations. A ratio greater than one generally indicates the availability of current resources larger than current demands." Quoting R. Anthony, Management Accounting 300 (3d ed. 1964), he added that "[t]he current ratio . . . 'is not only a measure of liquidity but also is a measure of the margin of safety that management maintains in order to allow for the inevitable unevenness in the flow of funds through the current asset and liability accounts.' " In Transit's case, the drop was from 1.5 in 1957 to .2 in 1970. See D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 10.

32. *Id.*

33. "Another comparison he used was the comparison of total debt to stockholders' equity. This illustrates the relationship between the creditors' and the owner's investments in the assets of the company. This ratio has increased from 5.9 in 1961 to 18.1 in 1970. That degree of creditor interest in the assets of the company indicates, according to the report, a high

degree of risk. Another test, interest coverage, was used to illustrate the ability of the company to meet interest payments with income operations. In 1957, funds generated were 4.2 times the rate of interest expense; in 1970 this had decreased to .7 times. From the point of view of a potential lender, this level was considered by Loconto to be very low. Finally, the comparison was made between funds generated by operations, after interest and taxes, to long-term debt not currently due and payable. This ratio has declined in Transit due largely to the increase in long-term debt. It has ranged from a high of 60.2 percent in 1961 to a low of 3.7 percent in 1968 and was 14.9 percent in 1970. 'This means,' said Loconto, 'that at the current level of funds generation, it would take more than seven years to retire all the existing debt if all available funds were applied to this purpose.' . . . Another meaningful test presented was stockholders' equity as a percent of total assets. This ratio has decreased from a high of 14.4 percent in 1961 to 5.2 percent in 1970. This, again, was considered quite low. Other ratios and tests made by Loconto similarly indicated a worsening financial picture for D.C. Transit." *Id.* at 10–11.

34. *Id.* at 11.

35. "With respect first to current ratio, the average of the comparison companies was 1.4, the lowest of the comparison companies being .5. D.C. Transit is .2, showing a much lower liquidity and smaller reserve for uneven flows of funds to meet current liabilities than any of the other companies. With respect to total debt to stockholders' equity, the highest of the comparison companies was 1.6 to 1; Transit is 18.1 to 1, eleven times higher than the highest of the com-

comparisons led to Loconto's conclusion "that the structure of the company is quite different from other companies in the industry" and that "[b]y all means, the differences are toward a structure that is more risky and less financially sound." [36] Loconto pointed out that a relatively large portion of Transit's assets were fixed and primarily nonoperating, generally yielding comparatively little return to Transit.[37] Loconto also noted that debt servicing requirements had increased with increasing debt, and that Transit, lacking sufficient funds from operations to meet those requirements, had been driven to "refinancing debt rather than paying it off." [38] "This refinancing practice," said the Commission, "in turn creates what Loconto called a 'high risk' situation because there is the chance that the creditors will be unwilling to refinance the debt, will call it instead, and there will not be funds available to pay it." [39] There was also a mixture of short- and long-term debt disclosing the financing of long-term assets with short-term and intermediate-term financing—by the Commission's characterization, "a poor business practice." [40]

On the basis of his analysis, Loconto identified four problems fundamental to achieving financial stability in Transit's case. These the Commission described thusly:

> First, he said some correction must be made in the fact of excessive short-term debt in relation to long-term debt. Also requiring correction was the problem of the excessive debt in relation to stockholders' equity. Since debt service demands are fixed and must be met, while there is discretion in whether stockholders will receive return when earnings are insufficient, the debt-equity ratio should be reduced. The third area of concern was the fact of the excessive non-earning assets. The consultant noted that the earnings of these assets, largely subsidiary real estate corporations, were very small in relation to their value. He also noted that there are on the books of those subsidiaries $3.1 million in accounts receivable in the form of loans to affiliates and former affiliates. These loans apparently are non-interest bearing. Thus, there appear to be assets in the form of receivables of the subsidiary corporations which could be recalled and made available to the parent operating company.

> The fourth problem is the inadequacy of funds provided by operations. This problem obviously can only be cured by increased farebox revenues of subsidization of farebox revenues from the taxpayer. However, the consultant points out that even a considerable increase in net income from this source would not be adequate to make principal payments due within

---

parison companies. Stockholders' equity as a percent of total assets indicated a much greater reliance on financing from sources other than the owners of D.C. Transit than in the comparison companies. The comparison of property, plant, and equipment to long-term debt and stockholders' equity indicated a heavier reliance on short-term financing to fund long-term assets, an undesirable and unsound practice." *Id.*

36. *Id.* at 12.

37. *Id.*

38. "The Loconto analysis of debt disclosed that debt increased steadily until 1965, and since then has remained between $23 million and $26 million. The overall cost of debt is at 6.82 percent on the average. Debt servicing requirements have increased with the increase in debt. Since 1957 the debt servicing requirements have grown from under $1.3 million to $6.7 million annually. Operations have not produced sufficient funds to meet the debt servicing requirements since 1965, and the result has been that the company has been forced to meet the debt service requirements by refinancing debt rather than paying it off." *Id.* at 12.

39. *Id.*

40. *Id.*

the coming year, which are in excess of $5 million.[41]

Loconto also submitted specific recommendations designed to strengthen Transit's ailing financial situation: reduction of current liabilities by $5 million during the first future annual period and eventually by $11 million; reduction of long-term debt by $4 million during the future annual period and ultimately by $8 million; and the acquisition of $3 million for the purchase of new buses.[42] He suggested, as potential sources for the needed funds, the calling of $3 million lent by Transit's subsidiaries,[43] possible sale of properties classified as operating properties but actually nonoperating,[44] and an increase of paid-in capital.[45] The latter step, it was said, "might well be justified because the initial capitalization was 'exceedingly small' and dividends of $4.4 million were paid out despite the fact that Transit had a low level of stockholders' equity." [46]

*The Commission's Orders*

By the Commission's assessment, "the record show[ed] clearly and in great detail Transit's seriously unstable and risky financial condition," [47] and this, the Commission found, bred an uneconomical and inefficient transportation operation and a resulting deterioration in service.[48] The Commission summarized:

> The record here shows that the present capital structure and debt structure of Transit do not reflect economic and efficient management. Non-operating assets have not been employed as advantageously to the parent operating company as prudent management practice would dictate. Under its current capital and debt structures, Transit is unable to provide and replenish the basic tools of its trade, its rolling stock. Its chronic cash-short condition results in too few drivers, too few mechanics, too few bus cleaners, and too high an incidence of failure to provide basic service. We consider that less than efficient management. The unnecessarily high debt service requirement is uneconomic. Operating on the brink of insolvency is surely not efficient and economic.[49]

The Commission further elucidated the connection between Transit's financial instability and its mediocre operation and service by adverting to specific examples. Two years previously, the Commission had granted Transit a 25 percent increase [50] in the basic District of Columbia fare, and had concurrently ordered Transit to escrow $620,000 over a six-month period as a 20 percent downpayment on the purchase of 85 new

41. *Id.* at 12–13.

42. *Id.* at 13.

43. As the Commission explained, Loconto had noted that Transit has assets, largely subsidiary real estate corporations, providing earnings that are very small in relation to their value, and that there are on the books of those subsidiaries $3.1 million in accounts receivable in the form of loans to affiliates and former affiliates. These loans apparently are non-interest bearing. Thus, there appear to be assets in the form of receivables of the subsidiary corporations which could be recalled and made available to the parent operating company.
*Id.* at 12–13.

44. The record shows that Loconto had reported that Transit owns real estate which is not used in its operations and which might provide funds up to $3.6 million on disposition. Loconto also had pointed to possible disposition of other assets, valued at $13 million, owned by Transit's subsidiaries.

45. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 13.

46. *Id.*

47. *Id.* at 14.

48. See D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 1.

49. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15.

50. From 32 cents to 40 cents, the current fare.

buses.[51] Transit never acquired the buses, admittedly for the reason that it was unable to obtain an 80 percent extension of credit.[52] While some financing was available with a downpayment approaching 50 percent, the escrow fund would have enabled acquisition of only 35 buses on those terms.[53] In the meantime, Transit's bus fleet aged considerably, with the adverse consequences inevitably attendant upon operation of antiquated buses.[54] As previously stated,[55] the Commission noted that Transit's too-small working capital has resulted in too few drivers, mechanics and bus cleaners, and consequent shortcomings in its service.[56] Overall, the Commission found that "the continued deterioration of the company's cash position has already caused a substantial deterioration in the service which it offers the public," [57] and "that unless this situation [is] remedied, service will continue to deteriorate to *unacceptable* levels." [58]

The Commission further found that Transit's "uneconomical and inefficient method of operation, and the resulting deterioration in service, could not be remedied merely with a fare increase," [59] and its orders delineated justifications. As it said on reconsideration,

Transit's financial instability is due largely to management decisions which are the critical factors in creating the present unsatisfactory financial structure. The Loconto report and testimony identified corporate decisions, not inadequate fare revenues, as the major factor in Transit's present financial instability. We concluded that additional funds, not increased fares alone, were required to remedy this situation. Here again, the expert testimony showed that the company's major need was additional funding from sources other than the

---

51. D.C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R.3d 1, 13, 29–30, rehearing denied, (Order No. 1057), 85 P.U.R. 3d 33 (1970).

52. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 9.

53. *Id.*

54. By the Commission's description, in its order denying reconsideration,

> The average age of a Transit bus has risen from 6.96 years as of December 31, 1966 to 9.79 years as of September 30, 1971. We know that older buses are less comfortable for the passenger. More importantly, old buses have a higher incidence of mechanical and equipment failure than newer equipment, thereby providing the public with a less reliable, and consequently less adequate, transportation service. Coupled with the company's failure to employ sufficient drivers, mechanics and cleaners, and the marked increase in trips not operated, this is another factor which directly and materially impacts upon the adequacy of its service.

D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 11 n. 11.

55. See text *supra* at note 49.

56. The Commission's order on reconsideration further elucidates:

> Reports which Transit has filed with us, and which we officially note, show a marked deterioration in the company's service. During May 1971, the company's driver force was only 16.8 below quota on a weekly average of 6.2 drivers-in-training. During May of this year, by contrast, the company was 42.7 drivers under quota on a weekly average, and had only a weekly average of 2.5 drivers-in-training. That this has impacted seriously on the adequacy of the company's service is clearly shown by the number of trip-blocks not operated:

| *1971* | | *1972* | |
|---|---|---|---|
| *Week Of* | *Trip Blocks Not Operated* | *Week Of* | *Trip Blocks Not Operated* |
| May 2 | 57 | May 7 | 106 |
| May 9 | 27 | May 14 | 73 |
| May 16 | 28 | May 21 | 132 |
| May 23 | 45 | May 28 | 191 |
| May 30 | 54 | | |

> A "trip block" represents the trips scheduled to be operated by a single bus on a single day.

D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 10 n. 10.

57. *Id.* at 9–10 (footnote omitted).

58. *Id.* at 11 (emphasis in original).

59. *Id.* at 1.

farebox, and, as we made clear in Order 1216, we agree.[60]

The Commission also discovered that its efforts to set fares which would meet the Compact's guidelines [61] "has produced only frustration. For any fare that would cover reasonable expenses and provide a reasonable return would clearly not provide either the form or the substance of financial stability." [62] The Commission further concluded that it could not ·

assure, simply by adjusting the fare, the continued adequacy of the company's service. Experience, particularly since the last fare increase of July 1970, and the facts of record submitted in this case, demonstrate that even if the fare were to be increased in the full amount requested by D.C. Transit, little if any improvement could be expected in what has been shown to be the very unstable financial condition of this company.[63]

This state of affairs, Transit's application for higher fares, posed something of a dilemma for the Commission. In its words,

What we see in the future if we increase the fare and do nothing more, is continued instability and a deterioration in the level and quality of service offered. In these circumstances, raising the fare would be asking the ratepayer to meet his obligation to the company without requiring the company to meet its obligation to the ratepayer. We do not perceive the Compact or the Constitution as imposing a unilateral obligation on the ratepayer.

Rather, we believe that the ratepayer and the company have a reciprocal obligation. We believe that obligation requires that the company give evidence that it can perform the services expected of it so that the ratepayer, in return for his contribution, will receive full value in the form of full services.[64]

The Commission then arrived at what it believed to be "the overriding and threshold question that we face in this case[:] can financial stability be restored to this company so that we may establish a rate which is 'just and reasonable' to all concerned?" [65] In the Commission's judgment, "the answer lies in the willingness of the company to alter the capital and debt structures of the company in the manner suggested by the Loconto report, i. e. through the application of funds needed to correct the financial imbalance Loconto identified." [66]

Thus the Commission came to frame directives to achieve the solution it deemed appropriate. Referring to the Loconto recommendation that $12 million be infused into Transit's capital structure during the future annual period,[67] the Commission was "fully agree[d] that debt must be reduced, not increased, and therefore new buses should be purchased for cash." It accordingly set $3 million for that purpose.[68] Because Transit already held $620,000 in escrow for bus purchases, this meant a net of $2.4 million.[69] Additionally, the Commission specified $4 million for reduction of outstanding debt.[70] The aggregate of $6.4 million,

---

60. *Id.* at 9.

61. The guidelines referred to are the Compact requirements regarding economical and efficient operation and adequate service, more fully discussed in Part II, *infra.*

62. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 8.

63. *Id.*

64. *Id.* at 14.

65. *Id.* at 15.

66. *Id.*

67. This recommendation, as the Commission reiterated, took into account $3.5 million in additional revenues anticipated from the proposed fares, leaving $8.5 million to be secured from other sources. *Id.*

68. *Id.*

69. *Id.*

70. *Id.* The Commission expained that it was "requiring something less than the full amount recommended by Loconto because we are allowing a limited period for

the Commission ruled, will be a precondition to any increase in fares.[71] It explained:

> In the past, when we have directed the company to take certain actions, performance has not always been forthcoming. This is most notably true in the bus purchase program.[72] We have no confidence that if we were to require the company to produce new revenue as a concurrent condition with granting a fare increase the new capital would be produced. Transit's attempt to assure us that they are taking some steps to correct the capital and debt situation are not sufficient. We will require assurances in the form of actual performance.[73]

### The Issues

In succeeding parts of this opinion, we deal with the issues Transit tenders for decision. We have arranged them in a logical progression of inquiries, grouped in three categories. Those in the first group relate to the procedural regularity of the Commission's action. Was the Commission compelled to establish a lawful fare for the future, or was it free to promulgate an order of another type, within the period for which it suspended Transit's tariffs? Could the Commission, in exercising its ratemaking powers, permissibly investigate the economy and efficiency of Transit's operation and the adequacy of its service?

Could the Commission, upon finding that economical, efficient and adequate transportation was not being afforded, direct corrective measures as a condition precedent to further consideration of a fare increase? We examine these problems in Part II. The next several issues involve the substantive validity of the orders. Do the reasons assigned for the Commission's directives survive claims that they lack evidentiary support? Do the Commission's findings pass muster? Were the Commission's preconditions legally warranted by the circumstances proven and found? We treat these matters in Part III. The last issue concerns the constitutional validity of the orders. Does due process of law require a regulatory agency to grant at least a break-even fare to a carrier found to be in default of its obligation to provide economical, efficient and adequate transportation? We resolve that question in Part IV.

## II. PROCEDURAL VALIDITY OF THE ORDERS

### Responsibility for Action Within Suspension Period

The Compact specifies mechanics for Commission consideration of fare changes proposed by regulated carriers. The process commences with the carrier's filing of a new tariff showing the changes it contemplates.[74] The tariff

---

the deposit of $2.4 million into escrow for buses and the reduction of debt by $4 million." *Id.*

71. *Id.*

72. See text *supra* at notes 50–54.

73. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15.
The dissenting commissioner emphasized the fact that Transit's expenses exceed its revenues. D.C. Transit Sys., Inc. (Order No. 1216-A) (WMATC May 25, 1972) (not yet reported), at 1. That, he felt, was "a condition which requires corrective action by the Commission," *id.* at 1, and that under both the Compact and the Constitution "it is mandatory for our Commission to permit Transit the opportunity to earn a *reasonable*

profit on its operations." *Id.* (emphasis in original) See also *id.* at 3–4. Other points advanced by the dissent were that the majority's directive to augment Transit's capital "amounts to an encrouchment [*sic*] on the prerogative of Management," *id.* at 2; that the majority's heavy reliance on Loconto's findings and recommendations was unwarranted, *id.;* that the remedy for Transit's past non-compliances with Commission orders was enforcement in court, *id.* at 3; and that Order No. 1216 was an impermissible extension of the suspension period authorized by the Compact, *id.* at 4.

74. Compact, *supra* note 1, tit. II, art. XII, § 5(e). Carriers are required to file with the Commission, and to keep open to public inspection, tariffs showing their fares

must state the date on which it will take effect, which cannot be less than 30 days after the date of filing without authorization by the Commission.[75] Prior to the effective date of the change, however, the Commission may suspend the new fares for an initial period terminating 90 days after the date on which those fares would otherwise have gone into effect.[76] The Commission may also extend the suspension period to a maximum of 120 days from the original suspension date.[77] The Compact provides that "[i]f, after hearing held on reasonable notice, the Commission finds that any fare . . . so suspended is unjust, unreasonable, or unduly preferential or unduly discriminatory either between riders or sections of the Metropolitan District, it shall issue an order prescribing the lawful fare . . . to be in effect." [78] The Compact further provides that "[i]f no such order is issued

within the suspension period (including any extension thereof) the fare, . . . involved shall take effect at the termination of such period." [79]

As we have mentioned, the Commission suspended Transit's alternate new-fare proposals for the full 120-day period permitted by the Compact. The parties are agreed, as are we, that the Compact then required the Commission to promulgate, within that period, an order which either (1) approved the new fares or which (2) appropriately (a) found these fares to be unlawful because "unjust, unreasonable, or unduly preferential or unduly discriminatory" and, in the latter event, which (b) proceeded to prescribe the "lawful rate." [80] Transit contends that the orders under review are invalid because they do not establish a "lawful fare" to be put into effect by the end of the authorized suspension period. The consequence, Transit argues,

and regulations and practices affecting fares, § 5(a), and are prohibited from charging any other fares, § 5(d).

75. Compact, *supra* note 1, tit. III, art. XII, § 5(e).

76. "The Commission, upon complaint or upon its own initiative, may suspend any fare, regulation, or practice shown in a tariff filed with it under Section 5 (except a tariff to which Section 5(b) applies), at any time before such fare, regulation, or practice would otherwise take effect. Such suspension shall be accomplished by filing with the tariff, and delivering to the carrier or carriers affected thereby, a notification in writing of such suspension. In determining whether any proposed change shall be suspended, the Commission shall give consideration to, among other things, the financial condition of the carrier, its revenue requirements, and whether the carrier is being operated economically and efficiently. The period of suspension shall terminate ninety (90) days after the date on which the fare, regulation, or practice involved would otherwise go into effect, unless the Commission extends such period as provided in paragraph (2)." Compact, *supra* note 1, tit. II, art. XII, § 6(a)(1). The exception referred to is for fares charged by carriers at the time the Compact became effective.

77. "If, after hearing held upon reasonable notice, the Commission finds that any fare, regulation or practice relating thereto, so suspended is unjust, unreasonable, or unduly preferential or unduly discriminatory either between riders or sections of the Metropolitan District, it shall issue an order prescribing the lawful fare, regulation, or practice to be in effect. The fare, regulation, or practice so prescribed shall take effect on the date specified in such order. If such an order has not been issued within the ninety (90) day suspension period provided for in paragraph (1), the Commission may from time to time extend such period, but in any event the suspension period shall terminate, no later than one hundred and twenty (120) days after the date the fare, regulation or practice involved was suspended. If no such order is issued within the suspension period (including any extension thereof), the fare, regulation or practice involved shall take effect at the termination of such period." Compact, *supra* note 1, tit. II, art. XII, § 6(a)(2). See also *Payne v. Washington Metropolitan Area Transit Comm'n*, 134 U.S. App.D.C. 321, 327–329, 415 F.2d 901, 907–909 (1968).

78. Compact, *supra* note 1, tit. II, art. XII, § 6(a)(2), quoted *supra* note 77.

79. Compact, *supra* note 1, tit. II, art. XII, § 6(a)(2), quoted *supra* note 77.

80. See notes 76–77, *supra*.

is that as a matter of law "the fare . . . involved"—the fare proposed by Transit [81]—automatically went into effect upon the expiration of that period.

We cannot accept Transit's theory. Within the suspension period indulged by the Compact, the Commission conducted and completed large-scale hearings on the new tariffs submitted by Transit and, by Order No. 1216, announced its decision as to those tariffs. In that order, the Commission found that Transit was derogating from its Compact obligation to furnish economical, efficient and adequate transportation service,[82] and that, for that reason, Transit was not entitled to an adjustment of its fares upward unless and until it remedied the deficiencies.[83] As Order No. 1216 expressly states, the Commission thus found that, under those circumstances, "the fares proposed . . . by D.C. Transit System, Inc., [are] unjust and unreasonable." [84] Beyond that, the Commission not only turned down the increases sought by

Transit but also specified the conditions which Transit must satisfy as a prerequisite to further consideration of any increase; [85] and Order No. 1216 directs "[t]hat D.C. Transit System, Inc., shall continue to charge the regular route fares presently in effect." [86] That, we think, was necessarily a conclusion that the existing fare—that previously established by the Commission—was the "lawful fare" that must continue in force until those conditions are met and a further fare order is promulgated.[87]

That disposition accords with what we believe the Compact signatories had in mind when they formulated the scheme for Commission handling of new-fare applications. It seems clear that the time limitations on suspensions were designed to assure that the Commission would act on the carrier's proposals in some appropriate fashion within the 120-day period. It appears equally obvious that those limitations do not afford a guaranty that the rate-making process will necessarily run its full course during that period.[88] The Com-

---

81. We assume that Transit refers to the 50-cent fare with free transfers specified in its first alternate tariff rather than the 45-cent fare plus 5-cent transfer charge proposed in its second alternate.

82. See text *supra* at notes 47–58.

83. See text *supra* at notes 59–64.

84. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 17.

85. See text *supra* at notes 67–71.

86. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 17.

87. Transit counters the Commission with the argument that since the latter foresaw a probable need for some fare increase after Transit's compliance with the Commission's precondition, the existing fares could not be the "lawful fare" to continue in effect. If this position is correct, the Commission could never precondition consideration of higher fares unless the precondition is satisfied within the suspension period. As will appear, we reject that reading of the Compact. See text *infra* at notes 89–91. And as we later hold, neither the Compact nor the Constitution compels an award of a fare increase to a carrier seriously defaulting in performance of its obligations to the public.

88. So much is immediately apparent from the fact that Commission orders emanating within a suspension period may be and frequently are subjected to judicial review. This Court has never felt that the ratemaking proceeding was so far ended that the fares proposed became automatically operative during a period consumed either by judicial review or by further Commission consideration necessitated by the decision on review. The Compact, *supra* note 1, tit. II, art. XII, § 17, makes it perfectly plain that the period for judicial review is not part of the restricted period of permissible Commission suspension, and the same conclusion must follow as to the period covered by any ensuing remand. When, in the past, we have found Commission error, we have pointed it out and remanded to the Commission for appropriate Commission action. *E. g.,* D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 350 F.2d 753 (en banc 1965) ; Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 342, 415 F.2d 922 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773

mission is required to complete its investigation of proposals and to render its decision within the Compact period. Where the hearings on the proposals develop satisfactorily the basis for outright approval or disapproval of new fares, the Commission is obligated to so decide, and to do so within the time the Compact specifies.

■ Where, however, the hearings firmly establish the need for action by the carrier as a precondition to a fare change, it becomes the Commission's responsibility to make, within the mandated period, an order to that effect. The Compact empowers the Commission not only to unconditionally grant or deny requests for new fares, but also "to . . . issue . . . such orders . . . as it may find necessary or appropriate to carry out [the Compact's] provisions. . . ." [89] That authorization imparts to the Commission's ratemaking process more than enough flexibility to accommodate needs to implement the specific demands of the Compact by orders tailored to the exigencies of particular cases.[90] Here, by the Commission's analysis, improved service and higher fares were interrelated problems demanding contemporaneous treatment,[91] and as is evident could not

possibly be accommodated within the suspension period. Furthermore, the Commission found that "until a new capital structure and debt structure are established, we cannot determine certain elements in the ratemaking formula. . . ."[92] We hold that where, as here, the Commission had found a carrier remiss in its obligations to the traveling public, the Compact does not interpose an inexorable barrier to promulgation, within the time limits fixed, of an appropriate remedial order, nor does it automatically put proposed new fares into operation upon expiration of the period for which they were suspended.

*Interrelationship of Service and Ratemaking Obligations*

■ Interpreting pertinent provisions of the Compact,[93] the Commission held that it is "required, in passing upon a rate application, to consider and weigh not only the interests of the company, including its right to a reasonable return on its investment, but also the interests of the public, including the public's right to economical, efficient and adequate transportation services."[94] This construction by the Commission of its own authorizing legislation would in any event command substantial deference in the courts.[95] In our view, de-

---

(1969). That, of course, is because we do not sit to fix fares, but rather to pass on the procedural and substantive propriety of Commission orders. Williams v. Washington Metropolitan Area Transit Comm'n, *supra*, 134 U.S.App.D.C. at 362–363, 415 F.2d at 942–943. Transit does not suggest that those remands were unlawful. The instant case summons no different principle. If Transit were to prevail on the merits, it would become entitled only to an order remanding the case to the Commission with directions that identified error be rectified and a "lawful fare" be then established.

89. "The Commission shall have power to perform any and all acts and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act. . . ." Compact, *supra* note 1, tit. II, art. XII, § 15.

90. See Payne v. Washington Metropolitan Area Transit Comm'n, *supra*, note 77, 134 U.S.App.D.C. 321, at 334–342, 415 F.2d 901, at 914–922. As we have indicated, the order may, in appropriate circumstances, continue the existing fare as "the lawful fare to be in effect." See text *supra* at note 87.

91. See text *supra* at note 64.

92. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 16.

93. Compact, *supra* note 1, tit. II, art. XII, §§ 6(a)(3), 6(a)(4).

94. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 4–5. See, to similar effect, D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 14–15.

95. Udall v. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ; Power Reactor Dev. Co. v. International Union of Electrical, Radio & Mach. Workers

rived upon independent investigation, it is eminently correct.

The Compact directs and empowers the Commission to proscribe "just and reasonable fares," [96] an entitlement immensely valuable to the carriers it regulates.[97] But the Compact also specifies that "[i]n the exercise of its power to prescribe [such] fares, . . . the Commission shall give due consideration" to four enumerated factors, among others,[98] two of which have special relevance to the issue at hand. One is "the need, in the public interest, of adequate and efficient transportation service by [regulated] carriers at the lowest cost consistent with the furnishing of such service." [99] The other is "the need of revenues sufficient to enable such carriers, under honest, economical, and efficient management, to provide. such service." [100] The parties to the Compact could hardly have more plainly mandated the well settled principle that ratemaking appropriately encompasses an examination and evaluation of the economy and efficiency of a public utility's operations [101] and the adequacy of its service.[102]

Int'l, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

96. Compact, *supra* note 1, tit. II, art. XII, § 6(a)(3). Concomitantly, it is "the duty of every carrier to . . . establish, observe, and enforce just and reasonable individual and joint fares. . ." Compact, *supra* note 1, tit. II, art. XII, § 3.

97. "A 'just and reasonable' rate is one that assures that all the enterprise's legitimate expenses will be met, and that enables it to cover interest on its debt, pay dividends sufficient to continue to attract investors, and retain a sufficient surplus to permit it to finance downpayments on new equipment and generally to provide both the form and substance of financial strength and stability." D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 121 U.S.App.D.C. 375 at 400, 350 F.2d 753 at 778.

98. "In the exercise of its power to prescribe just and reasonable fares and regulations and practices relating thereto, the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable such carriers, under honest, economical, and efficient manage-

ment, to provide such service." Compact, *supra* note 1, tit. II, art. XII, § 6(a)(3).

99. See note 98, *supra*. It is also "the duty of every carrier to furnish transportation subject to this Act as authorized by its certificate and . . . to provide safe and adequate service, equipment, and facilities in connection with such transportation." Compact, *supra* note 1, tit. II, art. XII, § 3.

100. See note 98, *supra*. See also Compact, *supra* note 1, tit. II, art. XII, §§ 6(a)(1), 6(a)(4).

101. *E. g.*, Key Sys. Transit Lines, 17 P. U.R.3d 505, 509 (Cal. Pub. Util. Comm'n 1957) (rate increase denied; by refusing to build necessary new facilities, company was unlawfully denying itself a reasonable opportunity to earn a fair return on its property devoted to public use; styling its order as interim, the Commission intended it to apply only as long as the conditions were not complied with); D.C. Transit Sys., Inc. (Order No. 4480), 25 P.U.R.3d 371, 378 (D.C. Pub. Util. Comm'n 1958) (rate increase accompanied by admonition that proof of economical management as well as provident control of expenditures will be necessary before authorization of any further increase); Mountain States Tel. & Tel. Co., 13 P. U.R.3d 560, 563 (Idaho Pub. Util. Comm'n 1956) (rate increase denied; necessary equipment alterations were undertaken belatedly at labor costs exceeding those which company would have incurred had work been done earlier); Summitville Water Co., 1921A, P.U.R. 616, 617–18 (Ind. Pub. Serv. Comm'n 1920) (rate increase denied; impossible to ascertain operating conditions of company from its financial records because

102. See note 102 on page 409.

■ It is equally clear that the obligations of carrier and rider here at stake are interrelated and reciprocal. The carrier's responsibility is "adequate and efficient transportation service" at the cheapest fares feasible,[103] and the rider's is to pay no more.[104] The carrier is entitled to revenues enabling provision of that service, but only to the extent needed under "honest, economical, and efficient management." [105] It is not entitled under the Compact to a fare raise irrespective of the quality of its operation and service. As the Commission, consistently with the weight of

they were so inefficiently maintained); Maine Pub. Utils. Comm'n v. Bangor Gas Co., 74 P.U.R. (n. s.) 23, 28–29 (Me. Pub. Util. Comm'n 1948) (rate increase authorized, but not to become effective until company completed necessary improvements); Lexington Water Co., 1928E P.U.R. 322, 345–46 (Mo. Pub. Serv. Comm'n 1928) (rate increase authorized, accompanied by orders that company cease providing an unsatisfactory water system and begin to operate efficiently); West Ohio Gas Co., 1928C P.U.R. 385, 392–93 (Ohio Pub. Util. Comm'n 1928) (rate increase denied; operating inefficiently and ignoring public needs); Northwestern Bell Tel. Co., 20 P.U.R.3d 385, 396 (S.D. Pub. Util. Comm'n 1957) (rate increase denied; management decision to operate at low debt-capital structure was expensive for ratepayers).

See Southern Bell Tel. & Tel. Co., 26 P.U.R.3d 55, 75–77, 111 (La. Pub. Util. Comm'n 1958), rev'd, 28 P.U.R.3d 303 (La.D.Ct.1958), aff'd, 239 La. 175, 118 So.2d 372 (1960), which collects authorities supporting the principle that ratemaking includes an examination and evaluation of the economy and efficiency of a public utility's operation and management; and Los Angeles Ry. Corp., 1928D P.U.R. 75, 78 (Cal. R.R. Comm'n 1928); Leavenworth, 1915B P.U.R. 611, 636 (Kan. Pub. Serv. Comm'n 1915); Breaux Bridge Tel. Co. Inc., 41 P.U.R.3d 260, 262 (La. Pub. Serv. Comm'n 1961); Durham Tel. Co., 14 P.U.R.3d 57, 67 (N.C. Util. Comm'n 1956); Dakota Util. Co., 1922C P.U.R. 805, 809 (N.D.Bd. of R.R. Comm'rs 1922).

102. Riverside Grove Water Co., Inc., 20 P.U.R.3d 117, 120 (Calif. Pub. Util. Comm'n 1957) (minimum system improvements required before increase would be put in effect); Parker, 19 P.U.R.3d 400, 403 (Ga. Pub. Serv. Comm'n 1957) (fares, reduced because quality of service was poor, could be restored 60 days thereafter if substantial improvement was demonstrated or could be reduced again if service deteriorated further); Midwest Tel.

Co., Inc., 23 P.U.R.3d 26, 31 (Ind. Pub. Serv. Comm'n 1958) (general rate increase authorized, withheld as to one region until service was upgraded and inspected and certified to be adequate); Northern Mo. Tel. Co., Inc., 49 P.U.R.3d 313, 317 (Mo. Pub. Serv. Comm'n 1963) (rate increase denied until rehabilitation of system and modern, adequate facilities were installed); Western Light & Tel. Co., Inc., 10 P.U.R.3d 70, 76 (Mo. Pub. Serv. Comm'n 1955) (increase denied until company could show that substandard service had been improved); Blair Tel. Co., 51 P.U.R.3d 262, 264 (Neb. St. Ry. Comm'n 1963) (increase permitted only after equipment was replaced); New York Tel. Co., 84 P.U.R.3d 321, 356–57 (N.Y. Pub. Serv. Comm'n 1970) (quality of service included in determination of reasonable rates); Western Light & Tel. Co., 17 P.U.R.3d 422, 428–29 (Okla. Corp. Comm'n 1957) (quality of service included in rate determination).

See Long Beach Motor Bus Co., 12 P.U.R.3d 198, 201–02, 204 (Calif. Pub. Util. Comm'n 1954); Rockville Water & Aqueduct Co., 78 P.U.R.3d 45, 51 (Conn. Pub. Util. Comm'n 1968), rehearing denied, 78 P.U.R.3d 53 (Conn. Pub. Util. Comm'n 1969); Indiana Assoc. Tel. Co., 88 P.U.R. (n. s.) 196, 200–01 (Ind. Pub. Serv. Comm'n 1950); United Corp., 1931B P.U.R. 497, 502–04 (Ind. Pub. Serv. Comm'n 1930); Ocean County Gas Co., 1919B P.U.R. 874, 880–81 (N.J. Bd. of Pub. Util. Comm'rs 1918); Salt Lake City Lines, 4 P.U.R.3d 144, 149 (Utah Pub. Serv. Comm'n 1954).

103. See text *supra* at note 99.

104. "The Commission is thus required to see to it that the fare-payers pay no more than is necessary to ensure the continued adequacy of the company's service and provide a return to the shareholders that is reasonable under the circumstances." D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 121 U.S.App.D.C. 375 at 402, 350 F.2d 753 at 780.

105. See text *supra* at note 100.

administrative [106] and judicial [107] authority elsewhere, declared:

> Upon a showing that it is now providing, and may in the future reasonably be expected to continue to provide, the economical, efficient and adequate transportation service to which the public is entitled, the carrier, in turn, is normally entitled to a fare which will produce a reasonable return. But where, as in this case, the record demonstrates that the carrier is in default with respect to its obligations under Section 6(a)(3) of the Compact, it is not entitled to a fare increase as a matter of law.[108]

■ The Commission has both the authority and the duty to assure that this reciprocity is maintained in practice. We have had occasion in the past to point out that the mandate that "just and reasonable fares" be set is itself "a standard which has invariably imposed an obligation to balance the interests of both the utility and the consumers." [109] As the Compact makes evident, the Commission's charge extends to the caliber of the carrier's operation and service as well as to the financial reasonableness of the fares it collects.[110] In the Commission's view, its "responsibility to protect the public interest is at least equal to [its] obligation to consider [the carrier's] interest.[111] In our own view, it is certainly no less.[112]

*Authority to Precondition Fare Increase*

The Commission is amply authorized to take action reasonably necessary to insure the performance of obligations which the Compact imposes on carriers. The Compact provides that it "shall be liberally construed to eliminate the evils described therein and to effectuate the purposes thereof." [113] As we have noted, the Compact also confers upon the Commission "power to . . . issue . . . such orders . . . as it may find necessary or appropriate to carry out" its provisions.[114] Like the Commission, we find within the Compact a positive mandate, applicable to ratemaking proceedings as well as others, that carriers provide, economically and efficiently, adequate transportation for the traveling public.[115]

The orders under attack precondition further Commission consideration of any new fare increase for Transit upon the latter's acquisition of new capital in substantial amount.[116] Satisfaction of that precondition, in the Commission's judgment, is essential to the economical and efficient provision of adequate trans-

---

106. Key Sys. Transit Lines, *supra* note 101, 17 P.U.R.3d at 509; Parker, *supra* note 102, 19 P.U.R.3d at 403; Northern Mo. Tel. Co., Inc., *supra* note 102, 49 P.U.R.3d at 317; Western Light & Tel. Co., Inc., *supra* note 102, 10 P.U.R.3d at 76. See notes 101–02, *supra*.

107. State v. Morgan, 277 N.C. 255, 177 S.E.2d 405, 412 (1970) (fare increases, granted by commission and affirmed by Court of Appeals, reversed by North Carolina Supreme Court, holding that commission had improperly failed to examine and evaluate inadequate services); United Tel. Co. v. Mayo, 215 So.2d 609, 610 (Fla., 1968), appeal dismissed, 394 U.S. 995, 89 S.Ct. 1589, 22 L.Ed.2d 74 (1969) (commission decision withholding rate increase pending service improvements affirmed). *Cf.* Township Committee of Lakewood v. Lakewood Water Co., 54 N.J.Super. 371, 148 A.2d 885, 890–892 (1959).

108. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 5.

109. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 121 U.S.App.D.C. 375 at 389, 350 F.2d 753 at 766 (emphasis in original).

110. See text *supra* at notes 98–102.

111. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 7. *Cf.* Smyth v. Ames, 169 U.S. 466, 545, 18 S.Ct. 418, 42 L.Ed. 819 (1897).

112. See Moss v. CAB, 139 U.S.App.D.C. 150, 151, 430 F.2d 891, 902 (1970).

113. Compact, *supra* note 1, tit. I, art. XI (2).

114. Compact, *supra* note 1, tit. II, art. XII, § 15, quoted in relevant part *supra* note 89.

115. See text *supra* at notes 96–112.

116. See text *supra* at notes 67–73.

portation to Transit's patrons.[117] Transit argues that nonetheless a precondition order was beyond its regulatory authority. We disagree.

█ Nobody seems to doubt the Commission's power to promulgate an order which simply directs a carrier to take measures necessary and appropriate to fulfillment of the Commission's responsibilities.[118] Nor is there room for doubting the validity of an order which gives such a direction concurrently with a grant of a fare increase;[119] indeed, the Commission has frequently issued orders of that type.[120] The sole question at this point is whether the Commission can insist upon compliance with such a condition prior to further treatment of an application for approval of higher fares. We answer that question in the affirmative.

Preconditions to fare increases designed to assure quality of service have long been recognized. More than a half-century ago, the Commission's predecessor, the Public Utilities Commission of the District of Columbia, turned down an otherwise justified fare increase on a showing of inadequacy of the Carrier's service notwithstanding that operating losses were inevitable without the increase.[121] Since then, commentators have advocated such preconditions,[122] and regulatory agencies have imposed[123] and courts have sus-

117. See text *supra* at notes 59–73.

118. See note 120, *infra*. See also Southern Gulf Util. Co., 88 P.U.R.3d 159 (1970), modified, 89 P.U.R.3d 448, 451–52 (Fla. Pub.Serv.Comm'n 1971); Key Sys. Transit Lines, *supra* note 101, 17 P.U.R. 3d at 511; Parker, *supra* note 102, 19 P.U.R.3d at 403.-

119. See note 120, *infra*; Long Beach Motor Bus Co., *supra* note 102, 12 P.U.R. 3d at 202, 204–05 (increase conditioned on service improvement); General Tel. Co., 28 P.U.R.3d 452, 455 (Ga.Pub.Serv. Comm'n 1959) (rate increase granted but in certain areas it was conditioned on service improvement); Ocean County Gas Co., *supra* note 102, 1919B P.U.R. at 881 (increase conditioned upon rendering of continuous, safe, adequate, and proper service as contemplated by New Jersey statute); Poughkeepsie & W. Falls R. Co., 1920C P.U.R. 995, 998 (N.Y.Pub.Serv.Comm'n 1920) (increase conditioned on cut-back in management expenses and salaries of general officers by 50%); Salt Lake City Lines, 4 P.U.R.3d 144, 149–50 (Utah Pub.Serv. Comm'n 1954) (increase conditioned on company taking immediate steps to make a survey and report findings promptly as to service improvements); Norwalk Independent Tel. Co., 27 P.U.R.3d 17, 19 (Wis.Pub.Serv.Comm'n 1959) (increase conditioned on company expending not less than four times the pro forma net revenues for plant repairs in current year).

120. See WMA Transit Co. (Order No. 1127) (March 24, 1971) (not yet reported), at 23 (hire safety consultant, implement improved procedures to repair air-conditioners and utilize radio system); Alexandria, Barcroft & Wash. Transit Co. (Order No. 1101) (Nov. 13, 1970) (not yet reported), at 24–25 (allocate funds for a marketing and promotion program; institute direct service on specified routes); D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 51, 85 P.U.R.3d at 12, 28 (Transit ordered to purchase buses); W. V. & M. Coach Co. (Order No. 1037) (April 23, 1970) (not yet reported), at 21 (employ additional supervisors and traffic checkers; expand telephone information services); D.C. Transit Sys., Inc. (Order No. 773), 72 P.U.R.3d 113, 133 (1968) (depreciation adjustment made contingent on Transit's compliance with order to purchase buses contained in same order); D.C. Transit Sys., Inc. (Order No. 245), 48 P.U.R.3d 385, 406, 416 (1963) (Commission directed Transit to order 82 new air-conditioned buses to be in service on or before October 1, 1963). *Cf.* Southeast Neighbors, Inc. v. Washington Metropolitan Area Transit Comm'n, 464 F.2d 804 (D.C. Cir., 1972), at 808 n. 5.

121. Metropolitan Coach Co. (Order No. 155), 1915D P.U.R. 740, 741 (D.C.Pub. Serv.Comm'n 1915.

122. G. Turner, Trends and Topics in Utility Regulation 379–81 (1969); H. Edgerton, Value of Service as a Factor in Rate Making, 32 Harv.L.Rev. 516, 520 (1919).

123. Riverside Grove Water Co., Inc., *supra* note 102, 20 P.U.R.3d at 120 (minimum system improvements required before increase would be allowed);

tained them.[124] Sometimes the order has set new rates and simultaneously suspended them pending demonstration of satisfactory compliance with the condition; [125] at other times, the order, as those here, has withheld consideration of the request for increase until the condition has been met.[126] That the order assumes one or the other form is obviously without consequence insofar as its essential validity is concerned.

We perceive no legal barrier to an order by the Commission, securely founded upon an evidentiary record, preconditioning a fare raise upon terms calculated to safeguard the public interest in economical, efficient and adequate transportation.[127] The legislative imposition of a grave responsibility ordinarily carries with it, as a matter of necessary implication, power to employ the means by which it may be discharged.[128] In this instance, the signatories to the Compact incorporated that thesis in an express grant of administrative authority.[129] By our measure, that authority—to take action "necessary or appropriate to carry out" the Compact's provisions [130]—is broad enough to enable the Commission to meet its regulatory responsibilities in this case. As the Commission said:

> We construe the Compact as vesting us with the necessary tools to enable us to discharge our responsibility to the public and insure that it obtains from carriers subject to our jurisdiction economic, efficient and adequate

---

Parker, *supra* note 102, 19 P.U.R.3d at 403 (rates reduced to make them commensurate with poor quality of service; subject to restoration after 60 days if sufficient improvement is demonstrated); Midwest Tel. Co., Inc., *supra* note 102, 23 P.U.R.3d at 31 (general rate increase authorized, withheld as to one area until service was made reasonably adequate, inspected and certified by engineers of department of commerce); Northern Mo. Tel. Co., Inc., *supra* note 102, 49 P.U.R.3d at 317 (rate increase denied until rehabilitation of system and modern facilities were installed); Cass County Tel. Co., 42 P.U.R. (n.s.) 48, 52 (Mo.Pub.Serv.Comm'n 1941) (rate increase withheld as to one area until system was restored and rehabilitated); Consolidated Tel. Co., 18 P.U.R.3d 152, 157 (Mo.Pub.Serv.Comm'n 1957) (50% of fare increase was authorized, remaining 50% increase withheld until service improvements were instituted); Western Light & Tel. Co., *supra* note 102, 10 P.U.R.3d 70, 76 (increase denied until company could show that substandard service has been improved); Blair Tel. Co., *supra* note 102, 51 P.U.R.3d at 262 (increase permitted only after old equipment was replaced with new); Southern Nev. Tel. Co., 11 P.U.R.3d 169, 173 (Nev. Pub.Util.Comm'n 1955) (increase allowed on services which had been modernized, an increase on the remainder was preconditioned on their modernization).

124. United Tel. Co. v. Mayo, *supra* note 107, Fla., 215 So.2d 609 at 610–611. See also State v. Morgan, *supra* note 107, 277 N.C. 255, 177 S.E.2d at 410; Town-

ship Committee of Lakewood v. Lakewood Water Co., *supra* note 107, 54 N.J.Super. 371, 148 A.2d 885 at 892.

125. Riverside Grove Water Co., Inc., *supra* note 102, 20 P.U.R.3d at 120; Midwest Tel. Co., Inc., *supra* note 102, 23 P.U.R. 3d at 262.

126. United Tel. Co. v. Mayo, *supra* note 107, Fla., 215 So.2d 609 at 610–611; Northern Mo. Tel. Co., Inc., *supra* note 102, 49 P.U.R.3d at 317.

127. Compare Elyria Tel. Co. v. Public Util. Comm'n, 158 Ohio 441, 110 N.E. 2d 59 (1953); General Tel. Co. v. Mich. Public Serv. Comm'n, 341 Mich. 620, 67 N.W.2d 882 (1954); Florida Tel. Corp. v. Carter, Fla., 70 So.2d 508 (1954), cases which turn on statutory provisions which do not authorize the regulatory agencies in those states to consider the adequacy of service, or the economy and efficiency of management, with United Tel. Co. v. Mayo, *supra* note 107, Fla., 215 So.2d at 609, decided after Florida's statute was changed authorizing the Florida Public Service Commission to consider efficiency, sufficiency and adequacy of facilities provided and services rendered.

128. FTC v. Raladan Co., 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); United States v. Denver & R. G. R.R. Co., 150 U.S. 1, 14–15, 14 S.Ct. 11, 37 L.Ed. 975 (1893); In re Neagle, 135 U.S. 1, 59, 10 S.Ct. 658, 34 L.Ed. 55 (1889).

129. See text *supra* at note 114.

130. See note 89, *supra*.

service. Surely, Congress and the Compact signatories did not impose upon us a duty to consider and protect the public interest, on the one hand, and then fetter us with a statutory scheme so rigid and unyielding as to make impossible the responsible discharge of that duty, on the other hand.[131]

## III. SUBSTANTIVE VALIDITY OF THE ORDERS

*Sufficiency of the Evidence*

The Commission found inefficiency in Transit's management, inadequacies in its service, and a relation of cause and effect between the two.[132] These findings, as we have indicated, were based principally on data and analyses presented in the Loconto report and elucidated by Loconto as a witness at the hearings.[133] Transit asserts that the findings lack substantial support in the evidence considered as a whole [134] and, in that connection, that the Commission erred in crediting the evidence Loconto supplied. We deem these arguments unavailing.

Transit did not object to admission of Loconto's report in evidence, nor to his competence as a witness. It did not move to strike either the report or the testimony. For these reasons, the Commission, on Transit's application for reconsideration, felt that Transit's credibility objection came too late.[135] It nonetheless examined the reasons in support of Transit's arguments and concluded that they were "wholly inade-

quate." [136] Transit did not include among the numerous assignments of error in its application for reconsideration any other specification that the findings on managment inefficiency and service inadequacy were not sufficiently supported by the vidence.

The Compact confers upon those affected by final Commission orders the privilege of requesting reconsideration.[137] The process is inaugurated by "an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration." [138] The Compact provides, however, that "[n]o person shall in any court urge or rely on any ground not so set forth in such application." [139] We search Transit's application for reconsideration in vain for anything "stating specifically" an insufficiency of supporting evidence as a ground for disturbing the Commission's findings on the caliber of Transit's management and service.

The Compact requirement that errors charged on reconsideration be pinpointed is not an empty formality. It subserves the same considerations fostered by the companion rule that contentions to be urged on appellate review of judicial proceedings be properly raised and preserved in the trial court.[140] Not the least of those considerations is the opportunity, through precise identification of the errors alleged, for administrative reexamination and correction prior to judicial intervention in the regulatory process.[141] We have long

---

131. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 7.

132. See text *supra* at notes 47–73.

133. See text *supra* at notes 25–46.

134. See, *e. g.*, Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–490, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

135. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 15.

136. *Id.*

137. Compact, *supra* note 1, tit. II, art. XII, § 16.

138. Compact, *supra* note 1, tit. II, art. XII, § 16.

139. Compact, *supra* note 1, tit. II, art. XII, § 16. In similar vein, that section further provides that "[n]o appeal shall lie from any order of the Commission until an application for reconsideration has been made and determined."

140. See Miller v. Avirom, 127 U.S.App. D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967). See also cases cited *infra* note 141.

141. Quick v. Martin, 130 U.S.App.D.C. 83, 86, 397 F.2d 644, 646 (1968); Broth-

admonished that points not subjected to agency scrutiny during administrative proceedings will not normally be entertained on judicial review.[142] That admonition, we have held, extends to claims that administrative findings are unsupported by substantial evidence.[143] Transit's insufficiency-of-evidence argument is properly before us only on the challenge to Loconto,[144] to which we now turn.

■■ No less in administrative than in judicial tribunals is it the factfinder's function to make the primary assessment as to the weight to be accorded particular items of evidence. Credibility determinations within the agency's sphere of expertise are peculiarly within its province, and courts will upset them only if made irrationally.[145] Our canvass of Transit's objections to Loconto's report and testimony gives us no cause to overrule the Commission on that score. We are mindful that there was evidence from which the Commission arguably might have concluded that Transit's operations are economically and efficiently conducted and its transportation service adequate, but "it is not a valid objection

that conflicts in the evidence might conceivably have been resolved differently, or other inferences drawn from the same record."[146] We sustain the Commission's findings on this branch of the litigation.

### Basis for Imposition of Precondition

■ Transit argues strenuously that the Commission erred in constructing its funding requirement as a condition precedent to further consideration of fare increases rather than as a condition to be met concurrently with the enjoyment of higher fares. We do not agree. We have already satisfied ourselves that the Commission has power to impose preconditions as well as concurrent conditions in fare proceedings.[147] We are also satisfied that the Commission was well within its regulatory province, after diagnosing Transit's financial sickness,[148] in prescribing an effective rather than a doubtful cure.[149] Our function as a reviewing tribunal is limited to determining whether the remedy selected by the Commission is arbitrary or unreasonable.[150] The Commission's prescription easily survives that test.[151]

erhood of Railway Trainmen v. Chicago, M., St. P. & P. R.R., 127 U.S.App.D.C. 58, 61–62, 380 F.2d 605, 608–609, cert. denied, 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967) ; Braniff Airways v. CAB, 126 U.S.App.D.C. 399, 413, 379 F.2d 453, 467 (1967).

142. See cases cited *supra* note 141.

143. Democrat Printing Co. v. FCC, 91 U.S. App.D.C. 72, 76–77 n. 10, 202 F.2d 298, 302–303 n. 10 (1952).

144. Since no explanation is being offered as to why Transit's other contentions were not presented to the Commission on reconsideration, we do not reach the question whether the Compact requirement may yield in exceptional circumstances.

145. See, *e. g.*, NLRB v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed. 2d 829 (1962) ; NLRB v. Geraldine Novelty Co., 173 F.2d 14, 18 (2d Cir. 1949) ; NLRB v. J. M. Machinery Corp., 410 F.2d 587, 590 (5th Cir. 1969) ; Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 685, 182 Ct.Cl. 507 (1968).

146. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 77, 134 U.S.App.D.C. 321, 334, 415 F.2d 901, 914 (1968).

147. See text *supra* at notes 113–131.

148. See Part I, *supra*.

149. See text *supra* at notes 113–131.

150. In re Standard Gas & Elec. Co., 151 F.2d 326, 331 (3d Cir. 1945), cert. denied, 327 U.S. 796, 66 S.Ct. 820, 90 L.Ed. 1022 (1946) ; Nadiak v. CAB, 305 F.2d 588, 593 (5th Cir. 1962), cert. denied, 372 U.S. 913, 83 S.Ct. 729, 9 L.Ed.2d 722 (1963).

151. Transit also attacks the Commission's orders for failure to make findings on certain subjects. The subjects referred to would be highly important in an undertaking to fix new fares, but they were irrelevant to the preconditions the Commission decreed. The orders establish no new fares, and the Commission's findings support the action which the orders require.

Order No. 1216 reflects the mature consideration the Commission gave the question whether a fare-increase order with concurrent conditions would sufficiently safeguard the public interest in economical, efficient and adequate transportation.[152] For four reasons, enlarged upon in its order on reconsideration, the Commission was persuaded that it would not.[153] The first was the Commission's conclusion, predicated on the results of the Loconto investigation, that "corporate decisions, not inadequate fare revenues, [were] the major factor in Transit's present financial instability," with the consequence "that additional funds, not increased fares alone, were required to remedy this situation." [154] The second was the documented history of Transit's unwillingness over the years despite the Commission's urgings, to firm up its shaky financial structure,[155] a "history [which] forced us to conclude that Transit cannot be relied upon voluntarily to remedy its own financial ills." [156] Thirdly, with Transit's failures to comply with prior Commission orders, particularly "[the] outstanding bus purchase order [which] has directly affected the adequacy of the company's service," [157] the Commission could find "no basis to believe that Transit would

---

152. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 14–16.

153. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 9–12.

154. See text *supra* at note 60.

155. The Commission summarized as follows:

In the first case which this Commission processed with regard to Transit's fares, we noted our concern "about the need for [Transit] to increase its equity in the business in order to insure the financial stability" of the carrier. [D.C. Transit Sys., Inc. (Order No. 245), 48 P.U.R.3d 385, 412 (1963)] In 1966, we reiterated this concern and again called upon Transit's management to remedy the situation. [D.C. Transit Sys., Inc. (Order No. 563), 63 P.U.R.3d 32, 42 (1966) ; D.C. Transit Sys. Inc. (Order No. 564), 63 P.U.R.3d 45, 65–67 (1966)]. At that time, however, we were able to conclude from the record then before us that Transit's financial structure had not interfered with its responsibilities "for rendering good service to the public." [*Id.* at 65.] Even with that finding, however, we stated that "Transit's debt-equity ratio should not be allowed to deteriorate further." [*Id.* at 66.] Two years later, we had occasion to disapprove two management decisions which resulted in a siphoning of cash into two subsidiary corporations, and we noted that "in the management of its cash working capital, the company's guiding principle must be the maximum protection of its ability to meet its obligations under its franchise, the Compact, and Commission orders." [D.C. Transit Sys., Inc. (Order No. 773), 72 P.U.R.3d 113, 133 (1968)] In that same order, we concluded that management's decisions had not seriously affected the adequacy of the company's service, and we found reason to believe that the company had recognized its obligations to the public and would take action to meet those responsibilities in the future. [*Id.*] Even so, we urged Transit "to raise the cash needed for transit operations through their nonoperating properties, if no other sources are available." [*Id.*] The next year, a similar exhortation was contained in our Order 984. [D.C. Transit Sys., Inc. (Order No. 984), 81 P.U.R.3d 417, 435 (1969)] Transit has thus been on notice of our concern for more than nine years during which, instead of taking steps to remedy the situation, it has deliberately allowed it to deteriorate.

D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 9–10 n. 9 (citations inserted).

156. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 11.

157. *Id.* at 11. In D.C. Transit Sys., Inc. (Order No. 245), *supra* note 120, 48 P.U.R.3d at 406, 416 (1963), the Commission imposed upon Transit a plan requiring replacement of a varying percentage of its fleet with new, air-conditioned buses. Compliance since 1967, the Commission found, was "erratic," D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 8, and no buses were purchased after 1968 although the requirement remained outstanding except for the period from October, 1969, to July, 1970. *Id.* The requirement was reestablished in D.C. Transit Sys., Inc. (Order

comply with concurrent conditions;"[158] instead, the Commission "determined that [its] precondition order was the only method by which we could assure the public that the company would deliver its part of the reciprocal obligations imposed upon it by the Compact."[159] Fourthly, the Commission cited its lack of power to insure compliance with a concurrent-condition order by requiring bond indemnifying the public[160] or by ordering reparations in the event of noncompliance[161] as additional factors supporting an order establishing preconditions.[162]

These reasons, in our view, amply sustain the Commission's decision to address the problem by conditions precedent to a far adjustment rather than conditions concurrent therewith. The Commission was called upon "to look into the future and determine whether, if rates were adjusted, the public could be reasonably assured that the company would correct the inefficient and uneconomic method of operation which we had identified and provide the adequate service which is the riders' due."[163] By the Commission's appraisal, "[t]he record clearly showed that a fare adjustment alone would not remedy the situation and that if our only order was an adjustment in fares, the result would be continued financial instability and a deterioration in the level and quality of transportation service afforded the public."[164] "Mere exhortation had not been productive," the Commission felt, and "drastic remedial action was required to bring the company's capital structure into balance to provide the stability necessary to achieve an efficient and economical transit operation."[165] We find no fault with the Commission's disposition of this aspect of the case.

To be sure, as Transit says, the Commission might have resorted to some other method of seeking compliance with the Compact's specifications respecting the quality of Transit's service. The Commission might, as Transit suggests, have ordered the capital changes it felt necessary and in the event of disobedience have gone to court to enjoin compliance.[166] It might have set the debt-equity ratio it deemed appropriate and then established fares hypothetically on that basis;[167] or it might have granted a fare increase with an accompanying requirement that Transit hold the disputed increment in a special reserve pending fulfillment of its Compact duties.[168] Undoubtedly other techniques in the Commission's regulatory arsenal were available to ameliorate, in some degree at least, Transit's current fare plight consistently with an improved response to its service obligations.

These considerations, however are largely beside the point. The relevant inquiries relate not to the availability of alternatives or the wisdom of shunning

---

No. 1052), *supra* note 51, 85 P.U.R.3d at 12, 28, but there was no compliance whatever by Transit thereafter.

158. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 11.

159. *Id.*

160. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 134 U.S.App.D.C. 342 at 361 n. 94, 415 F.2d 922 at 941 n. 94.

161. See *id.*

162. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 11.

163. *Id.* at 2.

164. *Id.*

165. *Id.*

166. See Compact, *supra* note 1, tit. II, art. XII, § 18(a).

167. See E. Nichols and F. Welch, Ruling Principles of Utility Regulation, Rate of Return Supplement A 157 et seq. (1964) ; 1 A. Priest, Principles of Public Utility Regulation 215 (1969).

168. Compare Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 134 U.S.App.D.C. 342 at 396, 415 F.2d 922 at 976; Bebchick v. Public Util. Comm'n, 115 U.S.App.D.C. 216, 232, 318 F.2d 187, 203, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963). But see Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 141 U.S.App.D.C. 79, 82 and n. 10, 436 F.2d 233, 236 and n. 10 (1970).

them, but solely to the legal propriety of the sanction the Commission selected.[169] The Compact, we repeat, empowers the Commission to take such action "as it may find necessary or appropriate to" achieve its objectives.[170] The choice is initially the Commission's, and we may upset it only if it is unlawful or was capriciously derived.[171] Here the Commission concluded that concurrent conditions would not effectuate the Compact's goals in terms of Transit's service. It said:

Mindful of the fact that our responsibility to protect the public interest is at least equal to our obligation to consider Transit's interests, we hold that while we may grant a fare increase, and condition that increase on a carrier's satisfaction of the steps we have found necessary to insure future performance of its statutory obligation to provide economical, efficient and adequate transportation, we are not compelled to do so if we conclude, as we have in this case, that such an order will not provide sufficient assurance that the public will be protected.[172]

Referring to the precondition specified in Order No. 1216, the Commission added:

We were forced to conclude that if fares were adjusted *before* the company produced the required funds, we would have no basis for insuring that they, in fact, would be forthcoming. This, we held, would be calling upon the bus rider to pay a fare to an inefficiently and uneconomically operated transit company without any assurance that the company would remedy those defects and fulfill its obliga-

tion to the rider by providing, in the future, efficient, economical, and adequate transportation. We declined to impose such a one-sided and unjust burden on the bus-riding public.[173]

We discern no basis for reversing the Commission in this regard.

We are not confronted on this review with any question as to the validity of the Commission's precondition arising from the carrier's inability to meet it. Transit did not contest Loconto's recommendation of preconditions during the hearings, and although Transit's application for reconsideration alleged a multitude of errors, it nowhere claimed impossibility of compliance. The Commission took note of that circumstance,[174] as we take care to do now. Transit does state in its briefs, not that it cannot raise the $6.4 million which the precondition set, but that it cannot do so within a 90-day period [175] without liquidation or sale of assets at prices below fair market value,[176] but the statement assumes an erroneous premise. Order No. 1216 does not require performance within 90 days. It simply admonishes that performance more than 90 days removed might necessitate the making of a fresh administrative record to enable disposition of Transit's application for a fare increase.[177] Indeed, Order No. 1219 explicates that "[i]n the event Transit elects not to comply with our precondition during the 90-day period following issuance of our main order, it is nevertheless free to apply for a rate adjustment whenever it does so comply, and to then ask us to use whatever portion of the present record may remain sufficiently fresh as to permit

---

169. See text *supra* at note 150.

170. See text *supra* at note 150.

171. See text *supra* at note 150.

172. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 7–8 (footnote omitted).

173. *Id.* at 2 (emphasis in original).

174. *Id.* at 14 n. 16.

175. See text *infra* at notes 177–78.

176. From this premise Transit argues that the precondition represents an effort to drive it out of business, a technique to which we have recently spoken. Southeast Neighbors, Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 120, at 6–9. It suffices here to say simply that, as we now explain in text, Transit misreads the Commission's orders.

177. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 16.

proper disposition of its application." [178] We have every confidence that, once compliance is forthcoming, the Commission will maximize its use of the present administrative record, and will proceed expeditiously to a resolution of Transit's request for a fare increase. [179]

## IV. CONSTITUTIONALITY OF THE COMMISSION'S ACTION

Asserting that at existing fares it will be operating at a substantial loss in the future, Transit lays claim, as a matter of constitutional right, [180] to fares increased to a point which would enable the company to earn a fair return. The Commission recognized a probable need for additional revenues to achieve that level, [181] but concluded that a demonstration of Transit's willingness and ability to provide, economically and efficiently, adequate transportation to the traveling public was a prerequisite to invocation of that doctrine. [182] We are thus brought to the question whether the orders under consideration can stand consistently with the requirements of due process of law. [183]

■ It is, of course, well settled that a governmentally-fixed rate confining a public utility's return from operations to an amount below the point of confiscation violates due process. [184] In

---

178. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 14 n. 16.

179. We could not in any event deal with a question of impossibility of compliance on this review. As we have observed, the Compact precludes us from entertaining issues not previously raised before the Commission by an application for reconsideration. See text *supra* at notes 137–144. Transit has never presented any such claim to the Commission. Even apart from the Compact, its nature plainly demands that it be given initial consideration by the Commission.

180. It seems clear that the Commission, established by Congress for the District of Columbia and by two adjoining states, is subject to the prohibitions of both the Fifth and Fourteenth Amendments. The Commission so concluded, D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 12 n. 13, and so do we. However, these standards by which Transit's constitutional claim is to be measured are the same whether the Commission's action is tested by the one or the other. Heiner v. Donnan, 285 U.S. 312, 326, 52 S.Ct. 358, 76 L.Ed. 772 (1932); Coolidge v. Long, 282 U.S. 582, 596, 51 S.Ct. 306, 75 L.Ed. 562 (1931).

181. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 7, 16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 2.

182. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 15; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 1, 2.

183. Invoking the well settled rule that he who alleges confiscation has the burden of proving it by clear and convincing evidence, *e. g.*, Railroad Comm'n v. Pacific Gas & Elec. Co., 302 U.S. 388 401, 58 S.Ct. 334, 82 L.Ed. 319 (1938), the Commission points out that Transit's financial and statistical statements reveal operation at a profit during March and April, 1972, and argues that Transit cannot benefit from the constitutional rule it invokes. Transit, on the other hand, claims operating losses during January and February, 1972, and projects losses even more substantial during the remainder of the year. Since the orders under review are in no wise dependent upon Transit's operating gains or losses for the time being, the financial facts which the parties aver were not made subjects of findings. But Transit's predictions of losses from operation at existing fares during the future annual period are not seriously questioned, and the Commission's orders consistently reflect the opinion that once Transit complies with the precondition imposed, a fare increase is a very likely probability. D.C. Transit Sys., Inc. (Order No. 1216), *supra* note 5, at 7, 16; D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 2. We cannot say that in these circumstances Transit has not shown the precariousness of its financial situation sufficiently to enable presentation of its due process challenge as an unavoidable issue in that case.

184. Denver Union Stock Yard Co. v. United States, 304 U.S. 470, 475, 58 S.Ct. 990, 82 L.Ed. 1469 (1938); United Rys. & Elec. Co. v. West, 280 U.S. 234, 249, 50 S.Ct. 123, 74 L.Ed. 390 (1930); Banton v. Belt Line Ry., 268 U.S. 413, 416–417, 45 S.Ct. 534, 69 L.Ed. 1020 (1925); Bluefield Water Works & Improvement Co. v. West Virginia Pub.

Transit's past rate litigation, both the Commission[185] and this court[186] have been keenly sensitive to that principle. It is important to note, however, that the cases forging that limitation have dealt with situations wherein the quality of the utility's service to the public was not in issue.[187] The inquiry we are now summoned to make is whether an established inferiority in service makes for a difference in constitutional precept.

Our thoroughgoing research discloses that instances of denials or curtailments of rate increases because of poor service have been considered but infrequently problems reaching constitutional proportions. Where, however, the objection has been framed in terms of confiscation, quite uniformly it has been rejected.[188] A similar position is evident from the more numerous decisions leaving increases ineffective pending service improvements notwithstanding that the utility was left at or below the break-

even point in the meantime.[189] In a real sense, then, these decisions incorporate the view, expressed or implicit, that the utility's fulfillment of its service commitments is a *sine qua non* to constitutional protection under confiscation principles. Like the Commission, we would be hard put "to assume that regulatory agencies, both in this jurisdiction and elsewhere, have engaged in unconstitutional proceedings for over a half century."[190] For reasons now to be explained, we believe that they have not.

 It has long been recognized that the caliber of a utility's service need not remain a neutral factor in determinations as to its allowable return. The cases have consistently said that superior service commands a higher rate of return as a reward for management efficiency;[191] more importantly for present purposes, they have also maintained that inefficiency and inferior service service deserve less return than normally would be forthcoming.[192] Much

Serv. Comm'n, 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

185. *E. g.*, D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 51, 85 P.U.R.3d at 25; D.C. Transit Sys., Inc. (Order No. 984), 81 P.U.R.3d 417, 438 (WMATC 1969).

186. *E. g.*, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 168, 141 U.S.App. D.C. 79 at 81–82, 436 F.2d 233 at 235–236. See also D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 88, 121 U.S.App. D.C. 375 at 400, 350 F.2d 753 at 788.

187. *E. g.*, Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n, *supra* note 184.

188. Gay v. Damariscotta-Newcastle Water Co., 131 Me. 304, 162 A. 264, 265 (1932); Hamilton *v.* Caribou Water, Light & Power Co., 121 Me. 422, 117 A. 582, 584 (1922); New Jersey Cent. Traction Co. v. Board of Pub. Util. Comm'rs, 96 N.J.L. 90, 113 A. 692, 696 (1921). *Cf.* United Tel. Co. v. Mayo, *supra* note 107, Fla., 215 So.2d at 609. See generally, I. Barnes, Economics of Public Utility Regulation 601 (1942); D. Lilienthal, Regulation of Public Utilities

During the Depression, 46 Harv.L.Rev. 745, 761 (1933).

189. New Jersey Cent. Traction Co. v. Board of Public Util. Comm'rs, *supra* note 188, 96 N.J.L. 90, 113 A. 692 at 696; Rockville Water & Aqueduct Co., *supra* note 102, 78 P.U.R.3d at 52; Metropolitan Coach Co., *supra* note 121, 1915D P.U.R. at 741. *Cf.* Hamilton v. Caribou Water, Light & Power Co., *supra* note 188, 121 Me. 422, 117 A. 582 at 583–584.

190. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 5, at 13.

191. *E. g.*, New England Tel. & Tel. Co. v. New Hampshire, 104 N.H. 229, 183 A.2d 237, 244 (1952); LaSalle Tel. Co. v. Louisiana Pub. Serv. Comm'n, 245 La. 99, 157 So.2d 455, 458–459 (1963). See also Market St. Ry. v. Railroad Comm'n, 324 U.S. 548, 563, 65 S.Ct. 770, 89 L.Ed. 1171 (1945).

192. Parker, *supra* note 102, 19 P.U.R.3d at 403; Northern Mo. Tel. Co., Inc., *supra* note 102, 49 P.U.R.3d at 317; Consolidated Tel. Co., *supra* note 123, 18 P.U.R.3d at 157; Rochester, 25 P.U.R. 3d 262, 278 (N. Y. Pub. Serv. Comm'n 1957); Dakota Util. Co., *supra* note 101, 1922C P.U.R. at 809. See also Market

the same rationale undergirds the universal rule that expenditures incompatible with economical and efficient management are to be disallowed.[193] Eighty years ago, the Supreme Court, while acknowledging the unconstitutionality of unreasonable rates,[194] made these observations:

> It is agreed that the defendant's operating expenses for 1888 were $2,404,516.54. Of what do these operating expenses consist? Are they made up partially of extravagant salaries, —fifty to one hundred thousand dollars to the president, and in like proportion to subordinate officers? Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground that its enforcement would prevent the stockholders from receiving any dividends on their investments, or the bondholders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company; for if so advised, it might clearly appear that a prudent and honest management would, within the rates prescribed, secure to the bondholders their interest, and to the stockholders reasonable dividends. While the protection of vested rights of property is a supreme duty of the courts, it has not come to this: that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some

other improper way, transfer its earnings into what it is pleased to call "operating expenses."[195]

So, in Reagan v. Farmers' Loan & Trust Company,[196] the Court took pains to make clear that it was not

> laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others. There may be circumstances which would justify such a tariff. There may have been extravagance and a needless expenditure of money. There may be waste in the management of the road, enormous salaries, . . . .. The road may have been unwisely built, in localities where there is no sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built as well as the rights of those who have built the road.[197]

And in Smyth v. Ames,[198] the Court put the point succinctly:

> [W]hat the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.[199]

Not surprisingly, then, the Court, in Bluefield Water Works and Improvement Company v. Public Service Com-

St. Ry. v. Railroad Comm'n, *supra* note 191, 324 U.S. 548 at 563, 65 S.Ct. 770, 89 L.Ed. 1171; Breaux Bridge Tel. Co., *supra* note 101, 41 P.U.R.3d at 264.

193. *E. g.*, Acker v. United States, 298 U.S. 426, 430–431, 56 S.Ct. 824, 80 L.Ed. 1257 (1936); Trans World Airlines v. CAB, 128 U.S.App.D.C. 126, 135, 385 F.2d 648, 657 (1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968); Breaux Bridge Tel. Co., *supra* note 101, 41 P.U.R.3d at 262–63; D.C. Transit Sys., Inc. (Order No. 4480), *supra* note 101, 25 P.U.R.3d

at 377. See also text *infra* at notes 194–97.

194. Chicago & G. T. Ry. v. Wellman, 143 U.S. 339, 344, 12 S.Ct. 400, 36 L.Ed. 176 (1892).

195. *Id.* at 345–346, 12 S.Ct. at 402.

196. 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894).

197. *Id.* at 412, 14 S.Ct. at 1059.

198. 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).

199. *Id.* at 547, 18 S.Ct. at 434.

mission,[200] spoke of adequacy of return "under efficient and economical management."[201] Throughout the almost 50 years since *Bluefield* was decided, that standard has been gospel in the rate-making field.[202]

We believe the constitutionality of governmental recognition of the inter-relationship between fair return and quality service can hardly be doubted to-day. "Certainly," as the Supreme Court has said, "the due process clause of the Constitution is not violated when a Commission takes into consideration practical results to the public of advances which it has allowed in rates."[203] The context of that declaration was a rate proceeding which had culminated in a reduction of street railway fares from seven cents to six cents.[204] The seven-cent fare had been achieved by an experimental increase from a previously existing five-cent charge for the same transportation.[205] The regulatory agency had found that the six-cent rate afforded a reasonable return on the carrier's rate base and that it was "all or more than the reasonable value of the services being rendered to patrons."[206]

The Court pointed out that "[t]he consideration of service as a justification for rates" had arisen "upon a comparison of the service of the Company under the five-cent rate and under the seven-cent rate,"[207] and that the agency had "found that the 40 per cent increase of rate had been accompanied by a deterioration of service."[208] The Court also pointed out that "[s]ome factors in the bad service were beyond the Company's control" but that "others were found not to be without remedy by good management."[209] "That higher rates failed to improve, failed even to maintain, service" said the Court, "certainly removed one of the justifications for the increase which the Company was enjoying."[210] "So far as the public was concerned," the Court added, "the experiment with the seven-cent rate yielded them no better immediate service and, because of the Company's policies, gave them no prospect of more permanent service."[211] The Court held that "[t]o the extent that the [agency] was influenced by considerations of the value of service in this case, we find nothing that denies the Company any

---

200. *Supra* note 184.

201. *Id.* 262 U.S. 679 at 693, 43 S.Ct. 675, 67 L.Ed. 1176.

202. See cases cited *supra* notes 101–02.

203. Market St. Ry. v. Railroad Comm'n, *supra* note 191, 324 U.S. 548 at 563, 65 S.Ct. 770 at 778. The reference is to the Due Process Clause of the Fourteenth Amendment. *Id.* at 553, 65 S.Ct. 770.

204. *Id.* at 555, 65 S.Ct. 770.

205. *Id.*

206. *Id.* at 557, 65 S.Ct. at 775. As described by the Court, the agency had found "that the service had constantly deteriorated and was worse under the seven-cent fare than under the former five-cent fare," and that "some of the causes were beyond the Company's control" but that "after allowance for these causes" there was "evidence of long-time neglect, mismanagement, and indifference to urgent public needs." *Id.* Deficiencies in service were "failure to operate on schedule, long intervals between cars, followed by several cars operating with little

headway, overloading, inadequate inspection, and inadequately maintained rolling stock;" vehicles obsolete, and many out of service; a manpower shortage and an "entire system . . . suffering from deferred maintenance. . . ." *Id.* The agency's position was that allowances for depreciation should be devoted to replacement of depreciated property and not, as the carrier felt, to the discharge of debts. *Id.*

207. *Id.* at 563, 65 S.Ct. at 778. The Court deemed it unnecessary to consider the question whether rates not yielding a fair return can be justified by inferior service. *Id.* at 562, 65 S.Ct. 770. The Court found that the six-cent fare was not confiscatory and that, as shown by the accompanying quotation in text, the agency "did not make an independent valuation of the service to patrons and fix rates accordingly." *Id.*

208. *Id.* at 563, 65 S.Ct. at 778.

209. *Id.* See also note 206, *supra.*

210. *Id.*

211. *Id.*

rights possessed under the Federal Constitution." [212]

■ That holding, in our view, solidly supports the thesis that the caliber of a utility's service may constitutionally qualify as a prominent and even decisive factor in the regulation of its rates. We do not suggest that the case discussed and the one at bar are close parallels,[213] nor do we intimate a view as to whether, irrespective of other considerations, rates may lawfully be scaled in proportion to the public worth of the utility's service.[214] We do think, however, that the likely effect of a sought-after rate increase upon the quality of the service is one of the "practical results to the public" [215] to which due process indulges reasonable regulatory consideration.

■ The precise constitutional issue before us is whether the Commission exceeded the limits of due process when it made a fare raise contingent upon steps calculated to rectify serious deficiencies in the service Transit furnishes the busriding public. Transit's argument has one central theme: its revenues cannot be permitted to fall below the level of fair return, and surely not below the breakeven point, no matter what the circumstances, and even if its management is uneconomical and inefficient and its service inadequate. If Transit is correct, the Commission is powerless to sanction corrective measures by deferring further consideration of a fare increase. If Transit is correct, it may disregard its public responsibilities at will—as the Commission found that it has frequently done—[216] and yet insist that the public respond to its demands for higher fares. We cannot accept that position. We do not believe the Constitution left the Commission impotent to deal with the situation confronting it in a sensible manner.

The Due Process Clause strikes a balance between competing governmental and private interests at the point of reasonableness. Action rationally subserving a substantial governmental concern draws condemnation on due process grounds only if it is arbitrary or unreasonable.[217] The importance of the interests of three cooperating sovereigns in the quality of Transit's operations and service is manifest.[218] On the record before us, it must be concluded that Transit has not met its public responsibilities in those areas.[219] It must be accepted, too, that Transit can measure up if only it will,[220] and that preconditioning further consideration of a fare increase upon remedial steps by Transit is the only method of assuring that the public interest will be protected.[221] We cannot say that, in the circumstances here, the Commission's action in pursuing that course is either arbitrary or unreasonable.[222] By the same token, we

---

212. *Id.* at 563–564, 65 S.Ct. at 778.

213. The six-cent fare in *Market Street* was found to be nonconfiscatory, but the argument here is that the existing 40-cent fare is confiscatory. The former seven-cent fare in *Market Street* was experimental and it not only brought no increase in revenue but so discouraged patronage that continuation of service was threatened. *Id.* at 555–556, 563, 65 S.Ct. 770. No one seems in position to make those claims here. Moreover, the question here is not whether a fare can be reduced on account of poor service, but whether poor service can constitutionally justify postponement of consideration of an increase until the service is improved.

214. See notes 207, 213, *supra*.

215. See text *supra* at note 203.

216. See text *supra* at notes 50–58 and note 155, *supra*.

217. *E. g.,* Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) ; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937) ; Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934) ; Burnet v. Wells, 289 U.S. 670, 679, 53 S.Ct. 761, 77 L.Ed. 1439 (1933).

218. See text *supra* at notes 50–58.

219. See text *supra* at notes 132–146.

220. See text *supra* at notes 174–179.

221. See text *supra* at notes 64–73, 157–165.

222. See text *supra* at note 217.

do not perceive any due process violation occasioned by the Commission's orders. As the Commission said:

> If, indeed, the company temporarily sustains a loss while it complies with our precondition order, it will not be because we have ordered it to do so, but because the effects of the company's past decisions have now impacted so seriously upon its statutory obligation to provide the public with efficient, economical and adequate transportation service as to require us to direct remedial measures as a precondition to any fare adjustment. The Constitution does not guarantee a public utility immunity from loss occasioned by uneconomic and inefficient management decisions, and we do not believe that it bars a regulatory agency on a record such as this from taking adequate steps to protect the public interest even if the short term effect of such an order is a temporary loss to the company. We made clear in our main order, and we take this occasion to reiterate, that as soon as Transit indicates its willingness to fulfill its statutory obligations to the public, we stand ready to insure that the public fulfills its reciprocal obligations to Transit.[223]

In our view, the Constitution does not require more. In the aspects discussed herein, the orders under review are

Affirmed.

MacKINNON, Circuit Judge, concurring specially:

While I concur in the result here, I believe that the Commission, and to a certain extent our opinion, overstates the deficiencies of D.C. Transit. The overall situation has degenerated to the point where many blame Transit completely for the financial ills that have befallen it. Transit, in response, blames the Commission, encouraged by a vocal and irresponsible segment of the public, for refusing to provide the revenue needed for survival. To my view the responsibility for Transit's condition must be widely shared—there is merit to the contentions of all parties.

It is indeed true that Transit is presently in poor financial condition; and certainly the Commission, acting on behalf of the public interest it is bound to serve, is justified in seeking a capital structure for Transit that will reduce debt service expense and improve the overall financial stability of the company. But *ordering* Transit, in its ailing condition, to attract such large sums of new money may be analogous to a doctor ordering a patient who has just suffered a severe heart attack to get up and run a marathon. It may be possible to acquire new capital—I hope it is. But if Transit actually is as deficient in its operations as the Commission now contends, it may not be possible—investors are not generally attracted to poorly operated or failing ventures. I can join in the opinion of the majority affirming the Commission's decision here only because there is no basis *on this record* for concluding that it would be impossible for Transit to comply with the conditions imposed by the Commission.

It seems to me that the Commission could have been more helpful to Transit in attracting additional capital if it had determined the new fare (the Commission admits a fare increase is justifiable) and simultaneously suspended that fare pending satisfactory compliance with the conditions imposed here. Midwest Tel. Co., 23 P.U.R.3d 26, 31 (Ind. Pub. Serv. Comm'n 1958); Riverside Grove Water Co., 20 P.U.R.3d 117, 120 (Calif. Pub. Util. Comm'n 1957). That course of action would have provided potential investors assurance of a fare increase of pre-determined magnitude rather than having the question left to the vagaries of future Commission action. As Vice-Chairman Sullivan noted in his dissent to the Commission's order, that order leaves the Company— and potential investors—"dangling" in

---

223. D.C. Transit Sys., Inc. (Order No. 1219), *supra* note 6, at 13–14.

mid-air. This is hardly an attractive situation for attempting to raise substantial amounts of new capital.

Finally, I believe that the Commission's disposition of this matter is only temporarily valid because of the uncertainties left open by the present, inadequate, record. I do not consider that the Commission has fully faced the entire problem. It must eventually face up to the present need for more operating revenue, and it must eventually confront the issue of whether the conditions imposed by its order are possible of accomplishment or unreasonable by virtue of being impossible to meet. But these issues must be fully litigated before the Commission before they may be considered by us. While I thus believe that certain of the Commission's requirements appear to be somewhat unreasonable, there must be a fully developed record from the Commission before we could properly so find. Subject to these reservations I concur in the result reached by the majority opinion here.